678 F.2d 1211
 29 Fair Empl.Prac.Cas. 216,
29 Empl. Prac. Dec. P 32,862
Louis PINKARD, Edward Lofton, Richard Holston and Donnie
Sealie, on behalf of themselves and others
similarly situated, Plaintiffs-Appellants,
v.
PULLMAN-STANDARD, A DIVISION OF PULLMAN, INCORPORATED,
Defendant-Appellee.
 No. 79-2890.
 United States Court of Appeals,
Fifth Circuit.
 Unit B*
June 10, 1982.
 
 Elaine R. Jones, Barry L. Goldstein, Washington, D. C., for Pinkard & lofton.
 Thomas, Taliaferro, Forman, Burr & Murray, C. V. Stelzenmuller, Birmingham, Ala., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before KRAVITCH and THOMAS A. CLARK, Circuit Judges, and LYNNE,** District Judge.
 PER CURIAM:
 
 I.
 
 1
 The four plaintiffs-appellants in this case-Louis Pinkard, Edward Lofton, Richard Holston, and Donnie Sealie-appeal from a judgment entered in favor of defendant-appellee Pullman-Standard, a division of Pullman, Inc., after a bench trial below. They present a number of issues for our review. Because no two members of this panel agree upon all of the issues, we preface the separate opinions with this summary of our positions to explain the disposition of the appeal.
 
 
 2
 All four plaintiffs, former employees of defendant, brought suit claiming defendant discharged them because of their race. In addition, plaintiffs Pinkard and Lofton claimed they were discharged because they opposed racially discriminatory practices of defendant. The suit ripened as one with the four claims of racially-based discharge presented under 42 U.S.C. § 2000e-2 and 42 U.S.C. § 1981. The claims of retaliatory discharge made by Pinkard and Lofton were presented under 42 U.S.C. § 2000e-3 and 42 U.S.C. § 1981.[1] Plaintiffs sought to bring the suit as a class action, but the district court denied certification. After a trial on the merits, the court entered a memorandum opinion and granted defendant judgment as to each of the claims.
 
 
 3
 Most of the issues presented provoke no dissent among us. We are in agreement that the district court properly denied class certification. In addition, we agree that the judgment is to be affirmed as to plaintiffs Holston and Sealie. We also agree that the judgment is to be affirmed as to the § 1981 claims of racially-based discharge made by plaintiffs Pinkard and Lofton.
 
 
 4
 We part ways only with respect to the Title VII claims of Pinkard and Lofton and Pinkard's § 1981 claim of retaliatory discharge. Even as to the latter, our dispute is narrow. Furthermore, all agree that the judgment is to be affirmed as to Lofton's § 1981 claim of retaliatory discharge. Judge Kravitch and Judge Clark, however, with Judge Lynne dissenting, find that the district court erred in granting defendant judgment as to Pinkard's § 1981 retaliatory discharge claim. Accordingly, the judgment must be reversed as to that one claim. This is the only aspect of the judgment to be reversed.
 
 
 5
 Our positions as to the Title VII claims of Pinkard and Lofton are somewhat more involved. Pinkard and Lofton had not received the requisite right-to-sue notices from the Equal Employment Opportunity Commission at the time they filed suit under Title VII; subsequently, they did receive notices. Judge Kravitch and Judge Lynne conclude, over Judge Clark's dissent, that the notices Pinkard and Lofton received satisfied the right-to-sue notice requirement and consequently that the Title VII claims of Pinkard and Lofton were properly before the district court, which thought it had no jurisdiction over these claims but proceeded to consider them "out of an excess of caution." Judge Lynne would affirm the district court's disposition of both Lofton's and Pinkard's Title VII claims. Judge Kravitch, however, would affirm as to Lofton's Title VII claims and Pinkard's claim under 42 U.S.C. § 2000e-2, but would reverse as to Pinkard's claim under 42 U.S.C. § 2000e-3. Because of Judge Lynne's position and Judge Clark's view that the claims were not properly before the district court, the judgment must be affirmed as to the Title VII claims of Pinkard and Lofton.
 
 
 6
 In accordance with the foregoing summary, we reverse the judgment as to Pinkard's § 1981 claim of retaliatory discharge and remand for a determination of damages. In all other respects, the judgment is affirmed.
 
 II. Class Action Denial
 
 7
 Louis Pinkard and Edward Lofton filed suit under 42 U.S.C. § 2000e on February 17, 1976, prior to receipt of right-to-sue letters from the Equal Employment Opportunity Commission. Plaintiffs moved to add Richard Holston as a party plaintiff shortly after February 19, 1976, when Holston was notified by the EEOC of his right to sue. Like Pinkard and Lofton, Holston alleged in his EEOC complaint that Pullman discriminatorily discharged him because of his race. On July 28, 1976, Pinkard and Lofton moved to add Donnie Sealie as a party plaintiff, and the court granted the motion on August 11, 1976. Sealie had originally filed an employment discrimination charge against Pullman-Standard on May 6, 1975, alleging that he had been discharged because of his race. The Birmingham District Office of the Equal Employment Opportunity Commission issued Sealie a right-to-sue letter on June 15, 1976. On August 18, 1978, prior to the pretrial hearing in the case, the EEOC issued Pinkard and Lofton notice of their right to sue the company.[2]
 
 
 8
 On October 12, 1978, plaintiffs proceeded with a Fed.R.Civ.P. 23 class certification hearing in district court. Plaintiffs sought to certify "a class of all black employees of defendant company who were discharged ... within 180 days prior to the earliest filing with the EEOC of a charge of discrimination by any of the four named plaintiffs." The court refused to certify the class on the ground that the plaintiffs failed to carry their burden of proving "typicality of claims," as required under Fed.R.Civ.P. 23(a)(3).[3]
 
 
 9
 It is well settled that, where a case requires detailed investigations of the circumstances surrounding the claims of individual class members, that case does not lend itself to treatment as a class action. Reddix v. Lucky, 252 F.2d 930 (5th Cir. 1958). Similarly, this court recently refused to reverse a district court which had denied class certification in Crawford v. Western Electric Co., Inc., 614 F.2d 1300 (5th Cir. 1980), stating that:
 
 
 10
 The fact that plaintiffs are members of the same race as other employees and rejected job applicants whom they seek to represent in a class action is not enough in itself to require a finding under Rule 23 that their representation was adequate or that their claims were typical of the class.
 
 
 11
 Id. at 1304.
 
 
 12
 In the instant case the four named plaintiffs bring forward claims which are factually distinct. Consequently, we affirm the district court's finding that plaintiffs failed to meet the procedural requirements justifying class certification. The district court properly distinguished the Fifth Circuit decision, Hebert v. Monsanto Company, Texas City, Texas, 576 F.2d 77 (5th Cir. 1978), that plaintiffs cited as contrary to the Reddix "typicality" test. Although this court in Hebert reasoned that, "(i)f class actions were limited to factual typicality, class actions under Title VII would be impossible because, except in rare cases, the facts would not be identical," the court's decision to certify that class was based additionally upon the fact that plaintiffs had produced substantial statistical evidence of company-wide discriminatory policies. The trial court properly focused upon this distinction, concluding that "the (Hebert ) decision is clearly hung on the breadth of the defendant's policies involved there and the wide scope of the statistical evidence ... pertinent to show these policies." Record Excerpts, at 13. Consequently, we agree that Hebert does not provide a sufficient justification upon which to confer "typicality" in the face of the significant factual dissimilarities of plaintiffs' claims. Accordingly, we affirm the denial of class certification.
 
 III. Title VII
 A. Jurisdiction
 
 13
 1. Circuit Judge KRAVITCH with District Judge LYNNE, concurring.
 
 
 14
 Appellants Pinkard and Lofton filed charges with the EEOC on February 13, 1976 and commenced this civil action four days later. Neither party had received a right-to-sue letter from the EEOC at that time. They did, however, receive right-to-sue letters on August 18, 1978, prior to the pretrial order and approximately four months before trial. Nevertheless, on June 29, 1979, seven months after the trial, the district court dismissed Pinkard's and Lofton's Title VII claims, holding in its memorandum opinion that it lacked jurisdiction over the claims because the appellants failed to await the issuance of their right-to-sue letters before filing suit. We hold that receipt of a right-to-sue letter is a condition precedent to a Title VII claim rather than a jurisdictional prerequisite, and that here receipt of the letters by appellants prior to dismissal of their Title VII claims cured their failure to initially satisfy the condition precedent. Accordingly, we reverse the district court.
 
 
 15
 Before instituting a Title VII action in federal district court, a private plaintiff must file an EEOC complaint against the discriminating party within 180 days of the alleged discrimination and receive statutory notice of the right to sue the respondent named in the charge. 42 U.S.C. § 2000e-5(f)(1); Alexander v. Gardner-Denver Co., 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974); Nilsen v. City of Moss Point, Mississippi, 621 F.2d 117 (5th Cir. 1980). 42 U.S.C. § 2000e-5(f)(1) states in pertinent part:
 
 
 16
 If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice.
 
 
 17
 (Emphasis added). This court has not explicitly addressed the question whether the receipt of a right-to-sue letter is a jurisdictional prerequisite, which if not satisfied deprives federal courts of subject matter jurisdiction or whether the requirement is a condition precedent subject to equitable modification. In answering this question, however, we are guided by the Supreme Court's analysis in Zipes v. Trans World Airlines, Inc., --- U.S. ----, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), in which the Court expressly considered for the first time whether a precondition to a Title VII action constitutes a jurisdictional prerequisite.
 
 
 18
 In Zipes, the Court addressed whether the timely filing of an EEOC charge is a jurisdictional prerequisite or a requirement akin to a statute of limitations, which is subject to equitable modification. See Coke v. General Adjustment Bureau, Inc., 640 F.2d 584 (5th Cir. 1981) (en banc). The Court held "that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel and equitable tolling." Id. --- U.S. at ----, 102 S.Ct. at 1132. In so holding, the Court first observed that 42 U.S.C. § 2000e-5(f)(3),[4] which confers jurisdiction on federal district courts over claims brought under Title VII, "does not limit jurisdiction to those cases in which there has been a timely filing with the EEOC," and that the timely filing requirement does not speak in jurisdictional terms. Second, the Court found that the sparse legislative history indicates that Congress intended the filing requirement to operate more like a statute of limitations. Third, it concluded that to find the filing requirement a jurisdictional prerequisite would be inconsistent with prior case law, e.g., Albermarle Paper Co. v. Moody, 422 U.S. 405, 414 n.8, 95 S.Ct. 2362, 2370 n.8, 45 L.Ed.2d 280 (1975); Mohasco Co. v. Silver, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). Finally, the Court reasoned that holding the requirement to be not a jurisdictional prerequisite but a requirement subject to equitable modification furthers the remedial purpose of the act without negating the particular purpose of the filing requirement, which is to give prompt notice to the employer. Id. --- U.S. at ---- - ----, 102 S.Ct. at 1132-1134.
 
 
 19
 The application of the factors considered in Zipes v. Trans World Airlines, Inc. to the precondition involved in this case compels the conclusion that the receipt of a right-to-sue letter is not a jurisdictional prerequisite, but rather is a condition precedent subject to equitable modification. First, we note that 42 U.S.C. § 2000e-5(f)(3), the relevant jurisdictional provision, does not limit jurisdiction to those cases in which a plaintiff has received a right-to-sue letter. Nor does section 2000e-5(f)(1), which requires that plaintiffs receive statutory notice of the right to sue before bringing a Title VII action, speak in jurisdictional terms. Moreover, nothing in the legislative history indicates that Congress intended the receipt of a right-to-sue letter to constitute a jurisdictional prerequisite. Thus, we are not inclined to deviate from the plain meaning of the statute. See, e.g., State of Alabama v. Marshall, 626 F.2d 366, 368-69 (5th Cir. 1980).
 
 
 20
 The decisions of the Supreme Court and Fifth Circuit are also inconsistent with holding the receipt of a right-to-sue letter to be a jurisdictional prerequisite. Rather the decisions clearly indicate that the requirement is a condition precedent subject to equitable modification. See, e.g., Zipes v. Trans World Airlines, Inc., --- U.S. ----, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); Mohasco v. Silver, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980); Albermarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Sessions v. Rusk State Hospital, 648 F.2d 1066 (5th Cir. 1981); Coke v. General Adjustment Bureau, Inc., 640 F.2d 584 (5th Cir. 1981) (en banc); Clanton v. Orleans Parish School Board, 649 F.2d 1084 (5th Cir. 1981). For example, both the Supreme Court and Fifth Circuit have held that relief under Title VII may be awarded members of a class who neither filed an EEOC complaint nor received a right-to-sue letter. See United Air Lines, Inc. v. McDonald, 432 U.S. 385, 389 n.6, 97 S.Ct. 2464, 2467 n.6, 53 L.Ed.2d 423 (1977); Franks v. Bowman Transportation Co., 424 U.S. 747, 771, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976); Albermarle Paper Co. v. Moody, 422 U.S. 405, 414 n.8, 95 S.Ct. 2362, 2370 n.8, 45 L.Ed.2d 280 (1975); Miller v. International Paper Co., 408 F.2d 283 (5th Cir. 1969). This court in Crawford v. United States Steel Corp., 660 F.2d 663 (5th Cir. 1981) extended the rationale of those decisions to nonfiling plaintiffs in a multiple-plaintiff, non-class action, holding that in an action involving claims of several persons arising out of a similar discriminatory treatment, not all of them need to have filed EEOC charges as long as one or more of the plaintiffs had satisfied the requirement. Id. at 665. If the exhaustion of the preconditions to a Title VII action, including the receipt of a right-to-sue letter, were jurisdictional, neither this court nor the Supreme Court could modify the requirements to permit non-filing plaintiffs to obtain relief under Title VII. See Zipes v. Trans World Airlines, Inc., supra, --- U.S. at ----, 102 S.Ct. at 1134. Coke v. General Adjustment Bureau, Inc., 640 F.2d 584, 589 (5th Cir. 1981) (en banc). Only Congress can modify those requirements that it has deemed must be satisfied to permit lower federal courts to exercise jurisdiction over a cause of action. See Lockerty v. Phillips, 319 U.S. 182, 187, 63 S.Ct. 1019, 1022, 87 L.Ed. 1339 (1943).
 
 
 21
 Furthermore, both the Supreme Court and Fifth Circuit have found that the requirement that a plaintiff's Title VII action may be filed within 90 days after receiving a right-to-sue letter is not a jurisdictional prerequisite. See Mohasco Corp. v. Silver, supra; Sessions v. Rusk State Hospital, supra. In Mohasco Corp. v. Silver, supra, the Supreme Court observed that the respondent had not satisfied the requirement that a party file suit within 90 days after receiving a right-to-sue letter. However, rather than dismissing the action sua sponte as it would have done were the requirement a jurisdictional prerequisite, the Court considered the case properly before it because "(p) etitioner did not assert respondent's failure to file the action within 90 days as a defense." Id. 447 U.S. at 811 n.9, 100 S.Ct. at 2489 n.9. See Zipes v. Trans World Airlines, Inc., supra --- U.S. at ----, 102 S.Ct. at 1134. In Sessions v. Rusk State Hospital, 648 F.2d 1066 (5th Cir. 1981), this court expressly held that the 90-day filing requirement is not a jurisdictional prerequisite, but rather a requirement subject to equitable modification. The requirement that a plaintiff receive a right-to-sue letter before filing suit is implied from the provision that a plaintiff may bring suit within 90 days after receiving statutory notice of the right to sue. We discern no reason for treating the 90-day filing requirement as a condition precedent in the context of determining whether a civil action has been timely filed and treating that same requirement as a jurisdictional prerequisite when considering whether a plaintiff received statutory notice of the right to sue before bringing suit.
 
 
 22
 Finally, in Clanton v. Orleans Parish School Board, 649 F.2d 1084 (5th Cir. 1981), we considered circumstances similar to those in this case. There, the appellee contended that the district court lacked Title VII jurisdiction because the right-to-sue letter was issued by the EEOC rather than the Attorney General as required in a case involving a governmental entity under section 2000e-5(f)(1). We rejected this contention, stating "(w)hatever the merits of this contention, the fact that the wrong agency issued the initial right-to-sue letter is not dispositive, for on August 2, 1974, Streams, Marion Davis and Clanton received right-to-sue letters from the Attorney General, and under established law, this subsequent issuance of proper right-to-sue letters cured any defect that existed with respect to the original right-to-sue letter." Id. at 1095 n.13. See Henderson v. Eastern Freight Ways, Inc., 460 F.2d 258 (4th Cir. 1972), cert. denied, 410 U.S. 912, 93 S.Ct. 976, 35 L.Ed.2d 275 (1973). Here, Lofton and Pinkard had not yet received their right-to-sue letters when they filed suit. Unquestionably, the action was subject to dismissal without prejudice at that time; however, our decision in Clanton v. Orleans Parish School Board makes clear that the subsequent receipt of the right-to-sue letter cures the defect with respect to the original filing of this action.
 
 
 23
 The fourth factor considered in Zipes v. Trans World Airlines, Inc., supra, is also satisfied in this case. Treating the requirement that a plaintiff receive statutory notice of the right to sue before filing a civil action as a condition precedent that may be satisfied by the receipt of a right-to-sue letter while an action is still pending furthers the remedial purposes of the act without undermining the particular purpose of that requirement, to give the EEOC an opportunity to fulfill its function of investigating the charge and attempting conciliation. A Title VII action filed prior to the receipt of statutory notice of the right to sue does not preclude the EEOC from performing its administrative functions, and it is unlikely that permitting the subsequent receipt of a right-to-sue letter to cure the filing defect will encourage plaintiffs to attempt to bypass the administrative process because premature suits are subject to a motion to dismiss at any time before notice of the right to sue is received. Such a dismissal would be without prejudice, and the plaintiff could bring a new action upon receipt of a right-to-sue letter. To distinguish such an action, once dismissed and then renewed, from an action where the defect is cured while the action remains pending is to distinguish between a glass half full and a glass half empty. Barring a Title VII plaintiff, who received his right-to-sue letter after filing suit, from ever pursuing his Title VII claim would not only be anomalous, but also would be an extreme sanction, contrary to the general policy of the law to find a way to prevent the loss of valuable rights, not because something was done too late, but rather because it was done too soon. Avery v. Fischer, 360 F.2d 719, 723 (5th Cir. 1966). It would also contravene our well-established policy not to interpret Title VII's procedural requirements in a manner that bars substantive claims. "Mindful of the remedial and humanitarian underpinnings of Title VII and of the crucial role played by the private litigant in the statutory scheme, courts construing Title VII have been extremely reluctant to allow procedural technicalities to bar claims under the Act." Sanchez v. Standard Brands, Inc., 431 F.2d 455 (5th Cir. 1970). See Love v. Pullman Co., 404 U.S. 522, 527, 92 S.Ct. 616, 619, 30 L.Ed.2d 679 (1972).
 
 
 24
 In light of the foregoing, we conclude that the receipt of statutory notice of the right to sue is not a jurisdictional prerequisite, which if not satisfied deprives courts of subject matter jurisdiction; rather, the receipt of a right-to-sue letter is a condition precedent, which on proper occasion may be equitably modified. Here, we hold that the receipt of a right-to-sue letter subsequent to the commencement of a Title VII action, but while the action remains pending, satisfies the precondition that a plaintiff obtain statutory notice of the right to sue before filing a civil action under Title VII.
 
 
 25
 In this case, Pinkard and Lofton filed the Title VII suit as a class action four days after filing their complaint with the EEOC. Two months later, Holston, who had received a right-to-sue letter, was added as a named plaintiff. Since the complaint was framed as a class action, the jurisdictional prerequisites were arguably satisfied at that time. See Crawford v. United States Steel Corp., supra; Miller v. International Paper Co., supra. Except for the addition of Sealie, the case rested in this posture over two years until the district court denied class certification.[5] In the meantime, Pinkard and Lofton had received their right-to-sue letters. The reason given by the EEOC for issuing the letters was that this lawsuit was pending. Though the reason given was not one of the published conditions for which the EEOC issues right-to-sue letters, see 29 C.F.R. §§ 1601.19, 1601.28, the letters were nevertheless effective. Both letters explicitly stated that the EEOC had dismissed the charges and that issuance of the notice terminated administrative processing. Whether the EEOC was correct in dismissing the charges for the reason given is immaterial. Cf. Hefner v. New Orleans Public Service, Inc., 605 F.2d 893, 895-96 (5th Cir. 1979) (EEOC letter, which stated that the complainant's file had been administratively closed because the EEOC lacked jurisdiction to investigate the charge, was sufficient to trigger the ninety-day filing period whether or not the EEOC's conclusion was correct). Furthermore, more than 180 days had elapsed since Pinkard and Lofton first filed charges with the EEOC, and they had a right to obtain their statutory letters simply upon request, regardless of further administrative processing. 42 U.S.C. § 2000e-5(f)(1). Because Pinkard and Lofton had received right-to-sue letters while this action was pending, we find that the district court erred in dismissing their Title VII claims for lack of subject matter jurisdiction.[6]
 
 
 26
 2. Circuit Judge CLARK's Dissent on Jurisdiction.
 
 
 27
 I dissent from the court's determination, in the immediate preceding section, that the receipt of a right-to-sue letter after suit has been filed cured the failure to exhaust administrative remedies. The issue is not one of jurisdiction as classified by the majority, but one of exhaustion of administrative remedies. As a condition precedent to suing an employer for unlawful discriminatory discharge, an employee must first seek relief through the EEOC mediation machinery. The majority is telling every employee in the circuit that this procedure is no longer necessary; merely file your EEOC claim first, then file your lawsuit the next week, and after the expiration of 180 days obtain a right-to-sue letter from the EEOC in which it can say mediation has been obviated by the pending lawsuit. Pinkard and Lofton filed suit in February 1976 and received their right-to-sue letters in August of that year. The EEOC took no action because of the lawsuit. Pinkard and Lofton did not give the administrative procedures an opportunity to be activated. The majority approves of this by saying that a dismissal of the lawsuit would accomplish nothing because a lawsuit could be immediately refiled for the same claim. This is true because the statute permits filing suit if 180 days has expired. However, such leniency extended to Pinkard and Lofton now permits every employee to simultaneously file with the EEOC and the court, and the EEOC will naturally defer to the courts. This is contrary to the statute and puts our blessing on such unauthorized procedures.
 
 
 28
 I agree that the district court had subject matter jurisdiction. That question has now been fully answered by the Supreme Court in Zipes v. Trans World Airlines, --- U.S. ----, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), as it had been for the former Fifth Circuit in Coke v. General Adjustment Bureau, 640 F.2d 584 (5th Cir. 1981) (en banc). However, a district court must look to see whether a plaintiff has a plausible explanation for not having pursued the congressionally-mandated EEOC administrative procedures.[7]
 
 
 29
 Title VII requires a claimant to file his discrimination claim with the EEOC within 180 days of the incident giving rise to the claim. The EEOC then sets into motion the administrative machinery designed to reconcile the employee-employer dispute. If EEOC efforts fail, it issues to the employee a right-to-sue letter. The employee must then file suit within 90 days after the receipt of the letter. In order to prevent undue delays if the EEOC's mediation machinery is overloaded, an employee may obtain a right-to-sue letter and may sue the employer within 180 days after the filing of his EEOC claim. Any lawsuit filed before the receipt of the right-to-sue letter is premature and subject to dismissal.
 
 
 30
 The legislative history of Title VII is somewhat sparse. This is largely due to the fact that it was just a part of the momentous Civil Rights Act of 1964. Other parts of that Act attracted more attention in Congress. However, the Title VII procedural requirements are clear on their face and nothing in the legislative history contradicts this facial intent. It is clear that Congress did not intend for every employee who had an allegation of employment discrimination to have a cause of action in federal court absent the pursuit of EEOC administrative remedies. Thus, the EEOC effectively stands at the door of the courthouse in the congressional scheme.
 
 
 31
 One factor that motivated Congress to construct Title VII administrative framework was the belief that voluntary compliance with Title VII's mandate was preferable to compelled compliance. Dent v. St. Louis-San Francisco Railway Company, 406 F.2d 399, 402 (5th Cir. 1969); Stebbins v. Nationwide Mutual Insurance Company, 382 F.2d 267, 268 (4th Cir. 1967). Thus, the EEOC was instituted to effectuate this desire.
 
 
 32
 Another powerful motivating factor in this scheme is the protection of the work load of the courts. If the administrative procedures which are conditions precedent to filing lawsuits are eliminated, the courts would sink under an intolerably oppressive burden. Indeed, in 1975 for example, the EEOC had a backlog of over 120,000 charges (B. Schlei & P. Grossman, Employment Discrimination Law 769 (1975)). The EEOC, if fully given the chance to operate, may solve many employer-employee disputes through mediation. Thus, many potential lawsuits and the resulting court congestion may be avoided by giving the EEOC an opportunity to perform its statutorily-mandated function. The procedural formalities of Title VII should be respected for this reason.
 
 
 33
 The court's ruling today on this issue will have major adverse consequences. No plaintiff now need wait for the EEOC to mediate his claims with the employer before filing suit in the district court. Rather, in an attempt to get to trial earlier, plaintiffs will file complaints with the EEOC and the district court simultaneously. The EEOC, as in the instant case, may issue a right-to-sue letter simply because suit has already been filed in the district court. Thus, by holding that the receipt by Pinkard and Lofton of right-to-sue letters from the EEOC after their filing suit cures the procedural defect, the court invites abuse from Title VII plaintiffs.
 
 
 34
 Lofton and Pinkard wanted to sue under Title VII without pursuing their EEOC remedies. They filed their EEOC claims and promptly filed their lawsuits, after which they received their right-to-sue letters. Indeed, the reason the EEOC issued the right-to-sue letters was because this lawsuit was already pending in the district court. Thus, Pinkard and Lofton did not give the EEOC a chance to reconcile their differences with Pullman. This may well impose a significant burden upon the courts and it frustrates the congressional scheme. This situation should not be allowed to come to pass.
 
 
 35
 Requiring exhaustion of administrative remedies, unless there is some equitable reason for not doing so, is in accord with Gibson v. Kroger Co., 506 F.2d 647 (7th Cir.), cert. denied, 421 U.S. 914, 95 S.Ct. 1571, 43 L.Ed.2d 779 (1975). However, this position is not inconsistent with such cases as Henderson v. Eastern Freight Ways, Inc., 460 F.2d 258 (4th Cir.), cert. denied, 410 U.S. 912, 93 S.Ct. 976, 35 L.Ed.2d 275 (1972), and Clanton v. Orleans Parish School Board, 649 F.2d 1084 (5th Cir. 1981). Equitable considerations can validate a right-to-sue letter received after suit has been filed or even eliminate the necessity of obtaining one.
 
 
 36
 In Henderson, supra, relied upon by the majority, for example, the Fourth Circuit was confronted with a bizarre factual situation which mandated a finding for the plaintiff. The plaintiff there filed three charges at various times with the EEOC. The first charge was filed against the employer, the second was filed against the employer and the union, and the third was filed against the union. A copy of the second charge was submitted with the third charge. The first charge was dismissed by the EEOC with the plaintiff taking no action on it. The Commission issued a right-to-sue letter on the third charge in May 1969. The second charge followed "an erratic course" in the bureaucracy, "bobbing back and forth" until a right-to-sue letter was issued in early 1970. The plaintiff filed suit in August 1969 on charges two and three. It was unclear whether the right-to-sue letter issued in May 1969 covered charge two. Although the EEOC subsequently determined that it did not and issued another right-to-sue letter, the court of appeals ruled that the right-to-sue letter issued in 1970 cured any problem the plaintiff had with filing suit on charge two in 1969. Given the equities of that situation, the holding was clearly proper.
 
 
 37
 Although relied upon by the majority, Clanton v. Orleans Parish School Board, 649 F.2d 1084, 1095 (5th Cir. 1981), is in no manner similar on its facts or supportive of the majority's opinion. In that case, the EEOC, rather than the Attorney General, as arguably required by 42 U.S.C. § 2000e-5(f)(1), issued the right-to-sue letter. The panel held that a subsequent right-to-sue letter issued by the Attorney General rectified the situation, assuming arguendo, that the Attorney General and not the EEOC was required to issue the right-to-sue letter.
 
 
 38
 This court in Crawford v. United States Steel Corp., 660 F.2d 663 (5th Cir. 1981), was also confronted with equitable factors which mandated a holding that when several men have claims of similar discriminatory treatment at the hands of an employer, only one of them must file with the EEOC. Crawford arose out of the protracted and bitter litigation involving the employment practices of U.S. Steel at its Fairfield, Alabama plant. Originally, twenty-one black employees, most of whom had complied with all the Title VII requirements, filed suit against U.S. Steel. All of these plaintiffs had been eligible for backpay tenders under the nationwide steel industry consent decree approved in United States v. Allegheny-Ludlum Industries, Inc., 517 F.2d 826 (5th Cir. 1975) and were also members of the so-called "new Ford class" that first made its appearance in this circuit in United States v. United States Steel, 520 F.2d 1043 (5th Cir. 1976). However, the plaintiffs were dissatisfied with the relief offered them in Allegheny-Ludlum, which prompted them to file suit. Before the commencement of discovery, the plaintiffs sought leave to amend their complaint to allege a class action. The district court denied this motion and also granted summary judgment against seven of the twenty-one plaintiffs because they had not followed the proper EEOC procedures prior to filing suit. This court affirmed the district court's denial of class certification but reversed the summary judgment against the seven plaintiffs who had not filed EEOC complaints.
 
 
 39
 The panel in Crawford announced that the claims of the seven plaintiffs who failed to file the EEOC charges were substantially similar to the fourteen who followed the proper procedures. All claimed that they were given improper seniority dates, passed over for promotion, and denied adequate union representation. Further, the court stated that the purpose of the filing requirement was not served by requiring each plaintiff to file essentially identical charges. The mediation channels were already filled with claims substantially similar to the seven in question. Given the fact that the claims were virtually identical, the existence of the consent decree, and that nothing could be achieved through the administrative process, compelling reasons existed for waiving the formal requirements of Title VII actions.
 
 
 40
 In Clanton, Henderson, and Crawford, equitable factors were present which required a setting aside of the strict procedural requirements of Title VII. In Clanton, as in Henderson, an unusual factual situation brought about by the government's mishandled paperwork existed. In both cases, plaintiffs who in good faith attempted to comply with the EEOC requirements would have found their access to the courts barred through the fault of the government. Neither court could allow that scenario to come to pass. There are no such equities in the instant case. Instead of good faith, there is bad faith on the part of Pinkard and Lofton.
 
 
 41
 In Crawford, claims were so similar and the possibility of settlement was so unlikely, it would clearly have been unreasonable to force each individual plaintiff to rigidly comply with Title VII's requirements. Again, we have no such equities present here. All that Pinkard and Lofton have in common with Sealie and Holston (or, indeed, with each other) is that they are black and that they were fired by Pullman. Each of the four disputes were quite distinct and arose from very different factual situations. Therefore, Crawford too is inapposite.
 
 
 42
 Pinkard and Lofton ignored the statutorily-mandated EEOC procedures with no justification. Thus, the subsequent issuance of the right-to-sue letters did not cure the failure to exhaust as mandated by Congress.
 
 
 43
 Lastly, I note in passing that the fourth factor considered by the Supreme Court in Zipes v. Trans World Airlines, supra, is not satisfied in this case. The EEOC did not fulfill its function of investigating the employee's charge and attempting conciliation in the instant case. Rather, it simply issued a right-to-sue letter because the action was already pending in the district court. Thus, the statutorily-mandated procedures have been ignored both in form and in substance in the instant case.
 
 
 44
 For the above reasons, I am unable to accept the court's opinion on this issue. Therefore, I dissent.
 
 B. Merits of the Title VII Claims
 1. Circuit Judge KRAVITCH
 
 45
 The district court held that none of the plaintiffs proved that they were discriminatorily discharged in violation of Title VII. I agree with the district court's disposition of the Title VII claims raised by plaintiffs Sealie, Holston, and Lofton for the reasons discussed in Part III of this opinion. Similarly, I would affirm the district court's finding that Pinkard failed to establish that he was the victim of racial discrimination in violation of 42 U.S.C. § 2000e-2;[8] however, for the same reasons for which we reverse the district court's denial of Pinkard's § 1981 claim, Part III infra, the record compels the conclusion that Pullman-Standard Co. discharged Pinkard in retaliation for his opposition to unlawful employment practices in violation of 42 U.S.C. § 2000e-3,[9] and accordingly I would reverse the district court's disposition of Pinkard's Title VII claim raised under that section.
 
 2. Circuit Judge CLARK
 
 46
 As noted above, I do not believe that the Title VII claims of Pinkard and Lofton were properly before the district court. Therefore, I do not believe that they are entitled to a recovery.
 
 3. District Judge LYNNE
 
 47
 The logical analysis of the jurisdictional issue, authored by Judge Kravitch, is unanswerable. In concurring therewith, I add by way of emphasis that what we review is the court's conclusion that "it lacks jurisdiction over the claims of plaintiffs Pinkard and Lofton relating to Title VII," for the reason that neither had received a right-to-sue letter before filing his complaint. That the court erred is made crystal clear by Zipes v. Trans World Airlines, Inc., --- U.S. ----, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). If filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, it follows ineluctably that neither is the issuance of a letter which is triggered only by the filing of such a charge. I cannot agree that the doctrine of exhaustion of administrative remedies is apposite to the issue before us. It is noteworthy that in Zipes the Supreme Court did not bow in its direction in holding that the district court had authority to award relief.
 
 
 48
 Notwithstanding our holding that the district court erred in its determination that it lacked jurisdiction over the Title VII claims, I would affirm for the reason that the discharges complained of were expressly found by the court to have been for a legitimate, non-pretextual reason, a defense equally available to a claim of discriminatory discharge posited either upon 42 U.S.C. § 2000e-3(a) or 42 U.S.C. § 1981. In my opinion that finding was not clearly erroneous.
 
 4. Conclusion
 
 49
 Because the majority of the panel, although for different reasons, would deny the Title VII claims, the district court's disposition of these claims is affirmed.
 
 IV. The § 1981 Claims
 
 50
 We now turn to whether the trial court erred in concluding that the plaintiffs failed to establish a case of racial discrimination under 42 U.S.C. § 1981.[10] In this circuit, it is well settled that "Section 1981 is a parallel remedy against discrimination which may derive its legal principles from Title VII."[11] Therefore, in considering the merits of this appeal, we apply the now familiar McDonnell Douglas guidelines, as interpreted in Texas Dept. of Community Affairs v. Burdine,[12] for proving racial discrimination.[13] Plaintiff must first establish the prima facie elements of a discriminatory discharge. The defendant then has the burden of coming forward with a legitimate nondiscriminatory reason for its actions, after which the burden shifts back to the plaintiff to prove that the employer's stated justification is pretextual.
 
 A. Pinkard's Claims
 
 51
 1. Circuit Judge CLARK with Circuit Judge KRAVITCH, concurring.
 
 
 52
 Louis Pinkard was hired by Pullman-Standard in July 1962. He was assigned initially to the steel erection department as a freight assembler, a department which was 98% black with the sole exception of the riveter and foreman, who were white. For eight years, from 1962 until 1970, when Pinkard became a shop steward, Pinkard was a responsible and competent employee. Pinkard's disciplinary record during that time was exemplary. For over eight years he was never reprimanded, warned, or disciplined for any of his work-related or union activities. Neither did he initiate, nor participate in, the filing of any grievances.
 
 
 53
 The appellant began to rise through the ranks of union leadership in 1970. He first became a union shop steward, and then in August 1971, Pinkard was elevated to the position of foreman over the company's newly created night shift. The appellant held that position from August until November, and it was about this time that the relationship between Pinkard and the company began to change.
 
 
 54
 The first sign of conflict between the parties occurred in June 1971 and involved the circulation of a petition to change the number of cars which were produced on the production lineup within a given day. The union had authority, under the contract, to permit grievance committeemen to file such grievances, although Pinkard was at that time only a shop steward. The incident is significant because it demonstrated the nature of Pinkard's shifting relationship with the company.
 
 
 55
 The petition was initiated at a union meeting at the local union hall. That afternoon Pinkard and several other employees took the petition over to the home of Perry Thompson, President of the Local, who was ill at the time. As Pinkard testified:
 
 
 56
 He (Thompson) was ill at the time and he advised me that I should take this list and go in the plant the next morning at work and seek as many signatures as I could to present to the other grievance committeemen ....
 
 
 57
 Record, vol. 3, at 390.
 
 
 58
 After successfully gathering an impressive list of signatures the next day, Pinkard was called to James Hudson's office, Director of Industrial Relations for the company, and told that he was in violation of the contract prohibiting solicitation of signatures during company time. While the evidence regarding whether Pinkard actually solicited signatures during work time was conflicting, Pinkard was nonetheless informed "that this would be placed on his record." Id. at 391.
 
 
 59
 In June 1973, Pinkard was elevated to the position of grievance committeeman. Pinkard was the sole black committeeman among six. From this time forward the relationship between the appellant and the company became increasingly strained. During the three years between 1973 and 1976, Pinkard championed minority and union rights and filed numerous grievances alleging racial discrimination in various aspects of the company's operations. Although the court below found that some of these grievances "were frivolous," the court also found that "many were not."
 
 
 60
 In 1974, one year after becoming a grievance committeeman, Pinkard became involved in a major employment discrimination lawsuit against Pullman-Standard alleging that the company's departmental seniority system perpetuated the effects of past discrimination. That lawsuit culminated in Swint v. Pullman-Standard, 539 F.2d 77 (5th Cir. 1976), after remand, 624 F.2d 525 (5th Cir. 1980), rev'd. and remanded, --- U.S. ----, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).
 
 
 61
 Throughout the Swint litigation, Pinkard assumed a major role. He attended each of the sixteen days of trial, sat at counsel table, and assisted counsel in preparing for trial. He served a subpoena on at least one company official and was in every respect a highly visible and vocal participant throughout the proceedings. Everything in the record suggests that Pinkard was a major, if not the primary, force behind the litigation. The Swint case proceeded to trial, and the trial court ruled in favor of the company. Although Swint was reversed on appeal in this court, between the issuance of the district court opinion and the appellate court's reversal, Pinkard was fired.
 
 
 62
 It cannot be doubted that Pinkard's participation in the Swint trial further exacerbated the relationship between Pinkard and the company. The increased strain can readily be evidenced by a November 8, 1974 grievance which Pinkard filed against the company. In that grievance, Pinkard alleged that:
 
 
 63
 For some time now I have had the feeling that there is a conspiracy at the company to fire me. Is it because I filed charges at EEOC against the company? Is it because I testified in Federal Court against the company?
 
 
 64
 Two of the company representatives have made statements to Larry McCullough that they were going to fire me.
 
 
 65
 Record, vol. 3, at 573.
 
 
 66
 The grievance was investigated by the company, resulting in the release to Pinkard of his complete employment and disciplinary records. The company, however, concluded that "(t)here is no conspiracy on the part of the company to discharge Louis Pinkard." Id. Although this court draws no conclusions regarding the existence or nonexistence of the alleged conspiracy, we do consider this grievance, following immediately on the heels of the Swint trial, to be a significant indicator of the charged atmosphere that existed on February 4, 1976, the day Pinkard's alleged "insubordination" prompted the company to discharge appellant.
 
 
 67
 The incidents for which Pinkard was discharged occurred on February 4, 1976. We focus primarily on the events which occurred that day despite management's contention that prior incidents, including the petition circulation incident described above, contributed to their decision to discharge appellant. We do not consider the 1971 petition circulation or the alleged 1974 work stoppage to have been major contributing factors to Pinkard's discharge, and accordingly we focus our attentions on the events of February 4.
 
 
 68
 The incident which precipitated Pinkard's discharge involved insubordination toward a black foreman, Dave Mason. On February 4, shortly after arriving for work, Pinkard was approached by Neal Bell, a shop steward, and was asked to handle a written warning directed at an employee. On a previous occasion, Pinkard had orally reprimanded this employee for tardiness, and the written warning which Pinkard had been requested to give him concerned the identical incidents for which the employee had been orally reprimanded.
 
 
 69
 Based on this request, it was Pinkard's opinion that the employee was being subjected to disciplinary "double jeopardy," prompting Pinkard to ask the foreman, "Mr. Mason, how about you, Mr. Moss (Plant Manager) and myself and (the employee) having a little meeting to discuss this, because, we are supposed to have already settled it." Record, vol. 3, at 410. Although Mason stated that he believed such a meeting would serve no purpose, Pinkard requested that Mason find a relief man so that Pinkard could leave his assigned work area in order to resolve the matter, and Mason granted the request.
 
 
 70
 Pinkard and Mason then went to James Moss' office (the plant manager) to discuss the matter. Conflicting testimony was given as to what next transpired. According to both Pinkard and Mason, when the two men entered the room, Moss and another foreman were present, and Moss was in the process of writing the company's daily work reports at his desk. Pinkard said "good morning," but Moss and the other foreman continued with their paperwork. Although Mason's testimony corroborated Pinkard's testimony, the two men differed slightly as to the amount of time Pinkard was left standing in the office. As Pinkard testified:
 
 
 71
 Neither man spoke. A few minutes later Dave said, "Okay, Mr. Pinkard, go ahead with your complaint." I said "Well, they won't talk. They won't speak. They might not talk," just like that. Well, Moss whirled around in his chair and said, "Do you want to make something out of it?"
 
 
 72
 Record, vol. 3, at 410.
 
 
 73
 Mason's description of the incident correlates substantially with Pinkard's, except that Mason did not mention Moss' alleged retort to Pinkard. As Mason testified:
 
 
 74
 I don't know whether it was several minutes or not, but they kept working on their paper.
 
 
 75
 Q. (by counsel) Nobody was saying anything during that time?
 
 
 76
 A. Mr. Pinkard was talking to me. He said, "These people don't seem like they want to speak. I just as soon go to the front office."
 
 
 77
 Record, vol. 4, at 901.
 
 
 78
 Moss' testimony is only slightly different from Mason's and Pinkard's, although it permits inferences somewhat more favorable to the company. As Moss testified:
 
 
 79
 So, I looked up and spoke to Mr. Pinkard when he came in the door. I just went on filling my report out. I didn't like much having it filled out-I don't know, a matter of two or three minutes. Mr. Pinkard said, "These people don't even want to talk to me. I just as well to go on down to the main office."
 
 
 80
 By Pinkard's reference to the "front office," Pinkard had expressed his desire to go to the company's central office in order to press further his claim for a meeting at which the disciplined employee could be personally present to discuss the written warning. When Moss refused both of Pinkard's requests, Pinkard asked if he could obtain a witness who could testify that management had refused to allow Pinkard to seek out the plant manager.
 
 
 81
 At this point the testimony becomes even more conflicting. Mason and Moss both testified that Mason ordered Pinkard to return to work. Pinkard denied this. The district court found that the evidence as to whether Mason had so directed was conflicting, and therefore refused to base its decision upon Pinkard's alleged refusal to obey an order to return to work.
 
 
 82
 Pinkard then left Moss' office and tried to locate Neal Bell, a shop steward. Upon discovering that Bell had left his regular work station, Pinkard returned to his job and found Mason and Bell waiting for him. Approximately fifteen minutes had elapsed. Mason then stated to Pinkard that he had told Pinkard to report back to his job. Pinkard replied that Mason had not told him to return to the job, and when Mason insisted that he had so directed Pinkard, Pinkard stated, "Dave, you are lying. You didn't tell me that." Mason replied, "I have got two witnesses that heard me tell you that." Pinkard responded, "Dave, your two witnesses would be lying." Record, vol. 3, at 411. Mason then informed Pinkard that he should accompany Mason to the industrial relations assistant's office. Pinkard refused to come to the meeting. Mason then told him, "well, you go back and go on your job," which Pinkard did. Mason then reported back to plant management, telling them that Pinkard had refused to attend the meeting. At that point the industrial relations management decided to conduct a full investigation in order to determine whether Pinkard should be disciplined for insubordination.
 
 
 83
 During the next eight days, Pullman conducted its investigation, talked with each witness and employee involved, and worked in full cooperation with its highest level of industrial relations management in Chicago. The result was a letter issued on February 12, 1976, which had been prepared by the industrial relations department and signed by Moss. The letter stated:
 
 
 84
 After careful consideration of your conduct of last week, the Company has concluded that you have been guilty of serious misconduct, including acts of insubordination to Track Foreman Dave Mason. You have been repeatedly warned and continued in the past to follow the contractual grievance procedure in the handling of your own complaints or those of other employees .... Based on these matters and a careful review of your entire disciplinary and work record, we have decided to discharge you effective immediately upon your receipt of this notice.[14]
 
 
 85
 As soon as Pinkard was discharged, the company and management experienced an immediate lessening in tension. There can be no question that all the parties involved, with the possible exception of Pinkard, were relieved. A few excerpts from the testimony will convey this. James Moss testified, for example, that prior to Pinkard's discharge he had received approximately thirty-one grievances during the past year, but that "(a)fter he (Pinkard) left it was just like a different place to work. There wasn't no grievances." Record, vol. 4, at 848. Similarly, Dave Mason testified that, "after Mr. Pinkard got fired, everything went nice out there. You didn't have that kind of trouble. It was a whole lot better place to work." Id. at 898.
 
 
 86
 The trial court held that the plaintiff "gave the defendant ample justification for his discharge ... and the court nothing to substantiate his charge of racial discrimination." The court relied upon two grounds in so holding, appellant's abuse of the contractual grievance procedures and his insubordination.
 
 
 87
 Turning first to appellant's alleged abuse of the contractual grievance procedures, our own consideration of the transcript leads this court to find that the trial court's conclusion was clearly erroneous. It is true that the record demonstrates that Pinkard frequently engaged in methods of grievance resolution not specifically set forth in the collective bargaining agreement. The company contends, therefore, that Pinkard abused the contractual procedures, pointing specifically to Pinkard's efforts to secure an "extra-contractual" meeting on February 4. But the testimony of Pullman's own witness and the Director of Industrial Relations, James R. Hudson, reveals that informal resolution of grievances was frequently a preferred method of handling grievances, to the extent that informal meetings such as that requested by Pinkard were not without precedent at the Bessemer plant. When questioned by counsel, Hudson testified:
 
 
 88
 Q: Is there a precedent for such a meeting?
 
 
 89
 A: There have been times when the grievance committeeman would discuss matters with the department heads or people above the A level foreman at the plant, depending upon the circumstances.
 
 
 90
 Q: And there have also been times when the grievance committeeman would discuss particular grievances with persons in your office in Industrial Relations prior to the filing of a written grievance, haven't they?
 
 
 91
 A: Yes. There have been times when that has occurred.
 
 
 92
 Record, vol. 1, at 159.
 
 
 93
 The company contends alternatively that Pinkard abused the contractual grievance procedures by filing too many grievances. These grievances were those grievances of which the company kept track because they were submitted in writing and formally processed. We think it illogical for the company to complain on the one hand of appellant's failure to file written grievances and on the other of appellant's overuse of the formal grievance procedures. Moreover, the district court specifically found:
 
 
 94
 The evidence established that the plaintiff did take an active role as committeeman, and filed more grievances than his predecessors. Some were frivolous, many were not. This is insufficient cause, as the arbitrator ruled, to support discharge.
 
 
 95
 Having considered the evidence, we are finally persuaded by the testimony of Pullman's Plant Manager for Labor Relations, J. Fred Hull, that neither the union nor the management was entirely clear as to what constituted acceptable or unacceptable grievance resolution. We reach the inescapable conclusion that no one procedure was consistently adhered to. Hull himself admitted that after he "told Mr. Pinkard to follow the grievance procedure," he also told Pinkard "that certainly I would be glad to talk with him ...." Hull then testified:
 
 
 96
 Q: (By counsel for appellant) Now, does Pullman encourage the filing of written grievances as opposed to an attempted disposition of disputes by informal means?
 
 
 97
 A: Well, I don't know that I can give you a pinpoint answer .... We have-certainly, we have a lot of grievances that are filed .... I try not to tell people to "file a grievance." I seldom have the opportunity to make that statement either way.
 
 
 98
 Record, vol. 3, at 551-52.
 
 
 99
 When Pinkard's actions as grievance committeeman are considered in light of this testimony, the trial court's conclusion that plaintiff abused the contractual grievance procedures cannot be upheld, as it is clearly erroneous. While Pinkard might have employed greater tact in his duties as committeeman, it is clear to this court that plaintiff did not abuse the grievance procedures as they were in practice at the Bessemer, Alabama plant.
 
 
 100
 Having so held, we are left with the trial court's alternative holding that plaintiff's discharge was justifiable because of his insubordination. As the trial court put it, Pinkard's discharge was justified by the "unprovoked malevolence" which plaintiff displayed toward Dave Mason, and because of "Pinkard's loud refusal to go to the meeting Mason sought him to attend." The trial court concluded that Pinkard had more than demonstrated his "disdain for management" by his conduct on February 4, and consequently was properly discharged.
 
 
 101
 While the evidence revealed mutual antagonism between the parties, the decision in the case must not turn on such subjective factors as "unprovoked malevolence" and "disdain for management." Instead, the decision must turn on the facts indicating the employer's basis for the discharge. Was it for "insubordination" as contended by the employer, or was it because of Pinkard's efforts to represent the black employees of the plant as a union representative and a black activist? In evaluating plaintiff's claim of discriminatory treatment for his espousal of black employees' rights, the court found that "plaintiff's claim to have been discharged for racial prejudice resulting from these activities was unsupported by anything more than his own accusations." We find this clearly erroneous. We have reviewed all of the testimony carefully. The evidence, largely uncontradicted, clearly demonstrates that the discharge of Pinkard would never have occurred but for his union and racial activism. As mentioned, other similar incidents have been met by the employer with reprimands, and never with discharge.
 
 
 102
 The trial court made further reference to judicial proceedings which were entirely distinct from the instant action, stating:
 
 
 103
 The court takes note of plaintiff's other involvement in the courts of this district. In Calvin E. Parker, et al. v. Local Union No. 1466, United Steelworkers of America, AFL-CIO; Leonard Lewis; Louis Pinkard; and Arvil Hulsey, Civil Action No. 76-M-1450-S (N.D.Ala., filed March 15, 1979), the plaintiff was held liable in damages for his actions as vice-president of the Local. There, at a time since his discharge, plaintiff was found to have unlawfully interfered with the rights of Pullman employees.
 
 
 104
 The court's reference to an independent judicial proceeding, combined with its description of the Mason incident as a "venomous retort by a man whose resentment still showed through at trial," leads this court to the conclusion that the trial court improperly focused on plaintiff's antagonism without counterbalancing the defendant's own antagonism.
 
 
 105
 This court does not condone Pinkard's action in calling Mason a liar or question management's right to punish such behavior. The question we are faced with, however, is whether Pinkard's discharge was the proper punishment or whether, as appellant contends, his discharge was an overly severe penalty tainted to an impermissible degree by Pinkard's lawful advocacy of minority and union rights. The evidence clearly shows that it was the latter.[15]
 
 
 106
 In summary, we reverse the trial court's judgment pursuant to the standards set out in FRCP 52 because the court was clearly erroneous in finding that the company discharged Pinkard because of his abuse of contractual procedures and because of his insubordination. The oft-stated definitive test is as follows:
 
 
 107
 A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
 
 
 108
 United States v. U. S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The district court's findings are against the clear weight of the evidence. Credibility of witnesses is not an issue because there is no significant conflict in the evidence. Instead, this court is left with the definite and firm conviction that a mistake has been committed when both of the company's principal witnesses, Mr. Hudson and Mr. Hull, made it clear that the company did not object to informal resolution of grievance matters, and the evidence reflects that no employee had been discharged for insubordination for conduct committed very similar to that of Pinkard, which conduct occurred on February 4, 1976.
 
 
 109
 Nothing in the recent opinion of Pullman-Standard v. Swint, --- U.S. ----, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), affects this case. There the Court found that our court had erred in (1) resolving in the first instance a factual dispute which had not been considered by the district court and (2) failing to remand where findings are infirm because of an erroneous view of the law and the record permits two or more resolutions of the factual issue. Hence, we reverse the trial court and remand the case for a determination of damages.
 
 2. District Judge LYNNE's Dissent
 
 110
 In Swint v. Pullman-Standard, 539 F.2d 77, 105 (5th Cir. 1976), the Court held: "Insubordination, the principal reason given for the discharge ... was more than amply justified." Judge Guin's finding of ultimate fact with respect to Pinkard's claim of discriminatory discharge was: "The inevitable conclusion is that plaintiff was in fact insubordinate, that his insubordination was egregious, and that management thereby had a legitimate reason to terminate him. No prima facie showing of discrimination could be found, because no disparity in treatment was established."
 
 
 111
 While the court correctly states the controlling clearly erroneous standard of Rule 52(a), F.R.C.P., its conclusion that Pinkard's discharge was motivated in part by his lawful advocacy of minority rights is the product of the court's improper independent consideration of the totality of the circumstances found in the record. That is precisely the historical practice of the former Fifth Circuit condemned by the Supreme Court in Pullman-Standard v. Swint, --- U.S. ----, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).
 
 
 112
 Acknowledging tangentially that independent review of the record reveals that Pinkard was insubordinate, the Court demurs to the severity of the sanction of discharge as though insubordination may easily be quantified. It thereupon proceeds to resolve conflicts in the record evidence, to draw its own inferences and to make credibility choices in concluding that underlying the discharge there must have been a mixed motive and that the lower court's finding of a legitimate, non-pretextual discharge was clearly erroneous.
 
 
 113
 Admittedly there is substantial evidence in the record which, if credited, would have supported a finding by the District Court that Pinkard would not have been terminated for insubordination absent his aggressive espousal of the rights of minority employees. However, such a finding was not made. On the contrary, implicit in its finding of ultimate fact is the conclusion that the reason given for his discharge was not pretextual to mask retaliation for his advocacy of minority rights.
 
 
 114
 In concluding that the District Court's finding that the company discharged Pinkard because of his insubordination was clearly erroneous in that it was "against the clear weight of the evidence," ante at p. 1230, the court oversteps the bounds of appellate authority. Just the other day, in a followup to Swint, supra, the Supreme Court admonished:
 
 
 115
 By rejecting the District Court's findings simply because it would have given more weight to (certain evidence) than did the trial court, the Court of Appeals clearly erred. Determining the weight and credibility of the evidence is the special province of the trier of fact.... An Appellate court cannot substitute its interpretation of the evidence for that of the trial court simply because the reviewing court "might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent." United States v. Real Estate Boards, 339 U.S. 485, 495 (70 S.Ct. 711, 717, 94 L.Ed. 1007) (1950).
 
 
 116
 Inwood Laboratories, Inc. v. Ives Laboratories, Inc., --- U.S. ----, ----, 102 S.Ct. 2182, 2190, 72 L.Ed.2d 66 (1982).
 
 
 117
 To put the matter bluntly, the Court has substituted its own finding of ultimate fact for that of the District Court by rehearsing subsidiary facts to suit its purpose without a critical examination of the abundant record evidence which undercuts its conclusion.
 
 
 118
 I would affirm, and therefore I respectfully dissent.
 
 B. Holston's Claims
 
 119
 The trial court found that Richard Holston was discharged because of his extremely poor work record, and the evidence supports this finding. Between February 21, 1974, when Holston was hired, and July 24, 1975, when Holston was discharged, appellant was continually disciplined by the company because of his poor performance. Four months after he was hired he received a written warning for bad work. Two weeks later he was given a second warning, which, although later rescinded, was followed by a three-day suspension on August 24, 1974. On March 13, 1975, Holston was given a written warning for being absent from his work station during company time. Significantly, appellant filed no grievances for any of these disciplinary actions. Given his extremely unsatisfactory performance, the trial court was correct in concluding that the company was justified in discharging Holston on July 24, 1975, when Holston failed to follow the direct orders of his foreman Franklin Rodriguez.
 
 C. Lofton's Claims
 
 120
 We also affirm the trial court's determination that Edward Lofton failed to establish a prima facie showing that his discharge was motivated by racial discrimination or was in retaliation to his claimed unlawful employee practices. Lofton, who passed out handbills advocating a work slowdown during company time, was properly discharged for violation of the contract. Furthermore, we have read Lofton's record testimony and agree that appellant's testimony was vague and evasive. The trial court found that "plaintiff Lofton (is) a witness of dubious credibility," and we agree that Lofton's insistence that he could not read, in sharp contrast to a successful tenure as shop steward responsible for the filing of numerous grievances, supports the trial court's determination. Consequently, we affirm the court's dismissal of Lofton's claim under 42 U.S.C. § 1981.
 
 D. Sealie's Claims
 
 121
 Finally, we affirm the trial court's dismissal of plaintiff Donnie Sealie's Title VII and § 1981 claims. Donnie Sealie was discharged on January 10, 1975, one year after he was hired, for failure to follow the instructions of his foreman, Ed Hamaker, and for his previous disciplinary record with the company. In December 1974, Sealie had received a written warning for tardiness and for "jumping shifts," that is, reporting for a different shift from the one assigned. On the day of Sealie's discharge, plaintiff was operating his welding equipment in such a manner as to throw sparks on two other welders, in contravention of a plant rule. When asked to alter his actions so that the sparks would not continue to fall upon the two men, Sealie adamantly refused. After a conference between appellant and the plant's labor relations assistant, during which the appellant persisted in his refusal, Sealie was discharged. The trial court held that Sealie's reliance upon the fact that he was black and his foreman was white was insufficient to establish a prima facie showing of discrimination, and we agree. Sealie's actions demonstrated an unwillingness to cooperate with management. No racial discrimination was proved; consequently, we affirm.
 
 
 122
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 **
 Honorable Seybourn H. Lynne, U.S. District Court Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 For convenience, we will refer to the claims under 42 U.S.C. § 2000e as the Title VII claims and those under 42 U.S.C. § 1981 as the § 1981 claims
 
 
 [2]
 The reason given for the issuance of Pinkard and Lofton's right-to-sue letters was that suit was pending in federal district court regarding the identical issues, and therefore the Equal Employment Opportunity Commission charges were being dismissed
 
 
 [3]
 Fed.R.Civ.P. 23(a)(3) states, in relevant part:
 (a) One or more members of a class may sue or be sued as representative parties on behalf of all only if ...
 (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ...
 
 
 [4]
 42 U.S.C. § 2000e-5(f)(3) states in pertinent part:
 Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter.
 
 
 [5]
 In its memorandum opinion denying class certification, the district court stated that "(w)hile it appears that there are absent as to plaintiffs Louis Pinkard and Edward Lofton allegations of charges having been filed with the Equal Employment Opportunity Commission (EEOC) and of " Notice of Right to Sue" letters having been issued, defendant admits their existence." Pinkard v. Pullman-Standard, No. 76-G-0026-S (N.D.Ala.) (filed Oct. 31, 1978). The memorandum opinion was filed less than 90 days after Pinkard and Lofton had received their right-to-sue letters. Assuming arguendo that receipt of the letters did not cure appellants' error in prematurely filing this civil action and that the court at that time had dismissed the suit, appellants Pinkard and Lofton could have refiled their Title VII action within the requisite 90 days after receipt of their right-to-sue letters. 42 U.S.C. § 2000e-5(f)(1). But by the time district court dismissed the appellants' Title VII claims some eight months later, the 90-day limitation period for filing suit had run, leaving the appellants barred by statute from refiling suit under Title VII. Our holding today, while not condoning the premature filing of Title VII actions, protects plaintiffs such as appellants from losing their right to sue under Title VII where either the defendant has been dilatory in moving for dismissal of the suit or the court fails to act on such a motion prior to the plaintiff's receipt of their right-to-sue letters
 
 
 [6]
 The dissent asserts that the majority condones and encourages the filing of Title VII claims without the receipt of a right-to-sue letter and that our holding will cause the EEOC to cease its mediation efforts when a suit is prematurely filed. The dissent misinterprets our holding. We do not in any way approve the filing of suit prior to the receipt of a right-to-sue letter. As we have noted a prematurely filed suit is subject to dismissal upon proper motion at any time prior to the receipt of statutory notice of the right to sue. Moreover, contrary to the implications of the dissent, the filing of a Title VII action simply does not require the EEOC to terminate its mediation efforts or issue a right-to-sue letter
 
 
 [7]
 The relevant portion of 42 U.S.C. § 2000e-5(f)(1) states:
 If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice.
 
 
 [8]
 42 U.S.C. § 2000e-2 states in pertinent part:
 (a) It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.
 
 
 [9]
 42 U.S.C. § 2000e-3 states in pertinent part:
 It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
 
 
 [10]
 42 U.S.C. § 1981 states:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and no other.
 
 
 [11]
 Blum v. Gulf Oil Corp., 597 F.2d 936, 938 (5th Cir. 1979), and see Garcia v. Gloor, 609 F.2d 156, 164 (5th Cir. 1980)
 
 
 [12]
 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)
 
 
 [13]
 McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)
 
 
 [14]
 In evaluating management's response to the events of February 4, we note that no Pullman employee previously had been discharged for calling his foreman "a liar." Although the facts surrounding other name-calling incidents were less extreme than those involved in the instant case, we nevertheless acknowledge that A. L. Hulsey, a white union official, testified that he had heard other employees tell foremen that they were lying "many times." Hulsey also testified that he had said to his foreman, "Well, Hog Jaw, you are lying there. So and so just told me different." (Record, vol. 2, at 86.)
 
 
 [15]
 A claim under § 1981 may be based upon retaliatory action taken against an employee for the employee's lawful advocacy of the rights of racial minorities. See Setser v. Novack Inv. Co., 638 F.2d 1137 (8th Cir. 1981) (retaliatory action against prospective employee for filing a complaint with the EEOC alleging racial discrimination presents a § 1981 claim); Winston v. Lear Siegler, 558 F.2d 1266 (6th Cir. 1977) (a white party fired for protesting an asserted racially motivated firing of a non-white party may sue under § 1981); Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971), cert. denied, 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972) (a plaintiff alleging that he was discharged because he complained about racially discriminatory employment practices may intentionally bypass the EEOC and seek relief under § 1981)